MARTIN *v*. ARKANSAS POWER & LIGHT COMPANY.

4-6680                                           161 S. W. 2d 383

Opinion delivered April 13, 1942.

*E. W. Brockman,* for appellant.

*House, Moses & Holmes,* for appellee.

McHANEY, J.  On and prior to May 29, 1940, appellant, Clifton Martin, and his brother, DeWitt Martin, were in the employ of E. L. Bruce Company and Jack Galloway as termite exterminators.  On said date and also on May 27 and 28, they were engaged in such extermination work on the Bynum residence in Dermott, Arkansas.  At about 9:30 a. m. of the 29th, while engaged in sawing a floor joist in two for the purpose of removing the damaged portion thereof, DeWitt Martin's arm came in contact with an electric house wire under the house

where they were working, from which he received a charge of electricity which caused his death. Clifton Martin attempted to extricate his brother and received injury in doing so. Thereafter separate suits were filed by appellants, Clifton Martin and Mrs. Bertha Martin, the latter as administratrix of her husband's estate, to recover damages for personal injuries received by Clifton and for the death of DeWitt, against their employers and appellee. Nonsuits were taken by appellants as to the employers. The negligence charged and relied on was that the primary and secondary wires of appellee were strung through the tops of trees between the transformer and the Bynum residence; that current was permitted to pass from the primary wires to the secondary because of limbs on said trees coming in contact with both which would render the transformer useless; that a certain ground wire on the third wire of the service lines was not properly grounded; and that the injury to Clifton Martin and the death of DeWitt Martin were caused directly by an overcharge of electricity passing over the wires leading to the Bynum residence. Appellee's answer was a general denial and pleas of contributory negligence and assumed risk. Trial to a jury resulted in verdicts and judgments for appellee. This appeal followed.

A number of errors are assigned and argued for a reversal of these judgments which become unimportant, for the reason that, in our judgment, the court should have directed a verdict for appellee on the undisputed evidence and the physical facts and circumstances connected with the accident. These alleged errors, therefore, will not be discussed.

As before stated, appellant, Clifton Martin, and his brother were not in the employ of appellee. The house wires in the Bynum residence, including the wire under the house on which DeWitt Martin was electrocuted, did not belong to and were not installed by appellee. The service or secondary wires leading from the transformer and serving the Bynum residence also served some twelve to fifteen other residences in that vicinity, all of which received or had available exactly the same amount

of current at all times as the Bynum residence. The primary or high tension wires carried 2,300 volts of electricity. The transformer stepped this current down to 110 volts for domestic service, and there is no testimony that the transformer was out of order or that it was not properly functioning. There is testimony that both the primary and secondary wires passed through the tops of two trees and were adjacent to and may have at times come in contact with some of the branches of these trees which were between the transformer and the Bynum residence, and it is appellants' theory that the current from the high tension line was shorted or diverted to the service line by reason of contact with these limbs, causing an excess voltage on the service lines which killed DeWitt Martin and injured Clifton. Their expert witness said that it was possible for the current to be so diverted and that, in his opinion, that is what caused the injury. He said that a green tree limb was not a good conductor, but that, in his opinion, it was good enough to divert sufficient current to cause injury and death. This appears to be appellants' whole case, except some reliance is placed on an alleged defective ground wire on the third wire of the service circuit. We think the evidence given by the expert is lacking in definiteness and certainty. It is more or less speculative and conjectural. His conclusions depend upon assumed facts, such as a limb being a conductor and that if it were, why would not the current be grounded by the tree itself; that the same limb would have to contact both the primary and secondary wires at the same time and the latter at a point not insulated; and that the tree would not ground the current. It is undisputed that the Martins were working in close quarters, the floor joists being about thirty inches above the ground; that they had been working about two hours before the accident; that they were both wet with perspiration, indicating a hot day; that their clothes were wet and muddy; that while the ground under the house was dry, their wet clothes had contacted the dirt; that DeWitt Martin was sawing the floor joist when his right arm came in contact with the house wire, he sitting on his heels with his knees and toes on the

ground. Whether his arm came in contact with an uninsulated portion or bare spot on the house wire is in dispute. According to several reputable citizens, Clifton Martin stated in their presence, shortly after he had gotten his brother out from under the house, that his brother's arm contacted a bare portion of the wire after he had warned him of its bare condition just before the accident. But Clifton denied that he made any such statement. Whether he did or not is unimportant here, for, as we view it, there is no substantial evidence that an excess voltage came over the service wires, but that the accident was caused by the ordinary and usual voltage. It is undisputed that none of the electrical equipment in the Bynum residence was disturbed. No fuses were blown, no lights were burned out, no motors were damaged—nothing happened. The same is true as to all the other residences serviced by the same secondary circuit, or at least there is no evidence that any such equipment was damaged. It was shown, and we know it to be a fact, that if there is a greatly excess current coming in over house wires, all lights that are turned on will be burned out and the fuses blown. Appellants virtually admit, at least they do not deny, that the light globe on an extension cord used by them under the house, was still burning after the accident, thus conclusively showing there was no excess current sufficient to burn out the lights on the circuit.

It is well recognized that 110 volt current or even less will, under similar conditions as here shown to exist, cause death. It was so recognized and the authorities cited and quoted from in *Oklahoma Gas & Elec. Co.* v. *Frisbie,* 195 Ark. 210, 111 S. W. 2d 550, where we reversed the judgment and dismissed the cause on an allegation of excessive current because of a defective transformer. There the deceased was working under the house on wet or moist ground, while here the deceased and his clothes were wet to the extent that the dirt clung to them and appeared to be muddy. Thus the body was a good conductor in either case, and when contact was made with the live wire, it caused a short circuit through his body causing death. In that case tests were made to deter-

mine whether excess voltage was passing through the secondary wires and it was found there was not. Here, while no similar test was made, the fact that there was no excess current is shown by the fact that no lights were burned out, not even the one they were using, no fuses blown, no electrical appliances injured, and no interruption of service in any home so served. In the Frisbie case a screwdriver held in the hand of deceased was fused by the force of the current of 110 volts. As we there said: "To say that appellee's intestate came to his death by reason of appellant's negligence would require speculation not only as to the amount of current which proved fatal, but also as to the method by which such alleged excess charge entered the house. Neither allegation is established by any direct testimony, and *res ipsa loquitur* cannot be applied as a rule of law in a case where it is shown that the result—in this case death —might have been brought about by one of two or more speculative theories, neither of which is included or excluded by any affirmative evidence."

In *Arkansas-Missouri Power Corporation* v. *Powell,* 200 Ark. 309, 139 S. W. 2d 383, in reviewing the holding in the Frisbie case, we said: "In *Oklahoma Gas & Electric Company* v. *Frisbie,* 195 Ark. 210, 111 S. W. 2d 550, recovery was denied under the *res ipsa loquitur* doctrine where appellee's intestate was killed while working under a building. He came into contact with electricity of sufficient voltage and amperage to produce death within a very short period of time. As in the case at bar, the primary wires leading to the transformer through which electricity was supplied to the house under which Frisbie was working carried 2,300 volts. Frisbie was lying on his back on wet or moist ground and accidentally made contact with exposed wires while attempting to use a screwdriver. The tool was burned, and there was testimony that not less than 1,000 volts would have been required to produce the fused condition.

"The defendant showed that other residences and the administration building of the public school system were served from the transformer and there was no interruption of service.

"In the instant case it is shown that the 'Y' hut continued on the transformer; that there were no repairs, and that the voltage when tested shortly after accident was 112.

"In the Frisbie case, Herzog's Medical Jurisprudence is quoted as asserting that from 55 to 110 volts alternating current have frequently produced death, and may be regarded as dangerous."

We are, therefore, of the opinion that this case is ruled adversely to appellants by both the Frisbie and the Powell cases, and that the court should have directed a verdict for appellee at its request. Not having done so, and the jury having returned verdicts for appellee, the judgment in its favor so entered, must be affirmed. It is so ordered.

MEHAFFY, J., dissenting. I cannot agree with the majority in the statement that: "A number of errors are assigned and argued for a reversal of these judgments which become unimportant, for the reason that, in our judgment, the court should have directed a verdict for appellee on the undisputed evidence and the physical facts and circumstances connected with the accident."

The majority opinion, however, says that the errors alleged are not considered because the court should have directed a verdict for the appellee on the undisputed evidence and the physical facts and circumstances connected with the accident. All this court knows about the physical facts and circumstances is what was told by the witnesses, and the jury may or may not have believed them.

The appellant and his brother were engaged in a lawful business, work that had to be done, and the appellee knew this.

Lile Bynum testified that he was under the house about three weeks before Martin was killed, and that at that time the ground was particularly dry and dusty.

Clifton Martin, the appellant, testified that he and his brother had worked for the Bruce Company for the

past ten months; it was witness' duty to replace damaged material when the Terminix Company treated buildings for termites; that witness and his brother, DeWitt Martin, were directed to go to Dermott and do the necessary work for removing defective timbers; that his brother was killed by coming in contact with an electric wire near where he was working; that deceased had taken a hand saw and started to draw back in a backward stroke, and as he drew his right arm back, the electric wire came in contact with the outside of his arm below his shoulder.

But the majority say there was no substantial evidence that an excess voltage came over the service wire, but that the accident was caused by the ordinary and usual voltage. The opinion also says: "It was shown, and we know it to be a fact, that if there is a greatly excess current coming in over house wires, all lights that are turned on will be burned out and the fuses blown. Appellants virtually admit, at least they do not deny, that the light globe on an extension cord used by them under the house, was still burning after the accident, thus conclusively showing there was no excess current sufficient to burn out the lights on the circuit.

"It is well recognized that 110 volt current or even less will, under similar conditions as here shown to exist, cause death. It was so recognized and the authorities cited and quoted from in *Oklahoma Gas & Elec. Co.* v. *Frisbie,* 195 Ark. 210, 111 S. W. 2d 550, where we reversed the judgment and dismissed the cause on an allegation of excessive current because of a defective transformer."

The majority opinion says that the light globe used by appellant and his brother was still burning, thus conclusively showing there was no excess current sufficient to burn out the lights.

This court did not hold, as I understand the language, in the case of *Oklahoma Gas & Elec. Co.* v. *Frisbie, supra,* that 110 volts would cause death. It was said by the court in that case that death has frequently occurred in consequence of persons coming in contact with ex-

posed wiring, generally by forming a short circuit, either by standing on a wet floor and touching the wire or leaking electric fixture with one or both wet hands.

We have had evidence in this court from experts in which it was shown that 110 volts will not cause any serious damage and will not cause death. Of course, if there is a defective transformer, or if the conditions existed as testified to by Martin, the voltage would be very much in excess of 110. The opinion then says quoting from the Frisbie case, *supra,* that tests were made in that case to determine whether excess voltage was passing through the secondary wires, and it was found that it was not. The majority admit, however, that no similar test was made in this case.

I do not agree with the court in the statement that to say that Martin came to his death by reason of appellant's negligence would require speculation, not only as to the amount of current which proved fatal, but also as to the method by which such alleged excess charge entered the house.

That Martin was killed by coming in contact with the wire is not disputed, and whether it had excessive voltage was a question for the jury and not for this court.

The Idaho Supreme Court said in the case of *Staab* v. *Rocky Mountain Bell Tel. Co.,* 23 Idaho 314, 129 P. 1078: "As to whether or not the proper care and precaution had been taken by the light company to insulate these wires to guard them against employes and innocent persons, who might be working about them, was one of the facts on which there was a conflict of evidence, and this was submitted to the jury, and has been passed upon by them. The appellant was engaged in the business of generating, transmitting, and distributing the most dangerous and least understood article known to the business or commercial world, namely, electrical energy—unseen foe—and it was chargeable with the legal duty of so handling it as to protect the public, and especially those who might be called upon to come near or in contact with its wires, from dangers they could not see, and which they might readily overlook."

The evidence is conflicting and numbers of witnesses introduced by appellee to testify as to their lights in their residences said that they did not know whether the lights were burning out or not.

In the case of *Ark. P. & L. Co.* v. *Cates,* 180 Ark. 1003, 24 S. W. 2d 846, this court said: "A company maintaining electrical wires, over which a high voltage of electricity is conveyed, rendering them highly dangerous to others, is under the duty of using the necessary care and prudence at places where others may have a right to go, either for work, business, or pleasure, to prevent injury. It is the duty of the company, under such conditions, to keep the wires perfectly insulated, and it must exercise the utmost care to maintain them in this condition at such places. And the fact that it is very expensive or inconvenient to so insulate them will not excuse the company for failure to keep their wires perfectly insulated." *Ark. Gen. Utilities Co.* v. *Shipman,* 188 Ark. 580, 67 S. W. 178.

While the company is not required to insulate its wires, it must either do this or employ other sufficient safety methods to prevent contact with wires conveying the current at such places as danger of contact may reasonably be anticipated. *Ark. P. & L. Co.* v. *Hoover,* 182 Ark. 1065, 34 S. W. 2d 464.

It was contended that appellant was guilty of contributory negligence. We recently said in the case of *Southwestern Gas & Elec. Co.* v. *Murdock,* 183 Ark. 565, 37 S. W. 2d 100: "Even if the injured party's act contributed to the injury, this would not bar recovery unless his act was negligent. It is not the contributory act that bars recovery, but contributory negligence."

There was ample evidence to authorize the jury to find for the appellant, and there was no speculation about appellee's negligence. Under our system, the court declares the law, and the jury is the judge of the facts, not only of the credibility of the witnesses, but of the weight to be given to their testimony. And I cannot understand how a member of this court can think that he knows

more about the credibility of a witness and the weight that should be given to his testimony than do the jurors who have seen the witnesses, heard them testify, and observed their manner on the witness stand. I think when a judge undertakes to do this, it is purely a matter of speculation.

I think this case should be reversed and remanded for a new trial and let the jury pass on the facts and the court pass on the law.

I respectfully dissent from the holding of the majority, and Mr. Justice HUMPHREYS agrees with me in this dissent.